

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

September 5, 2019

**BY ECF**

The Honorable Kimba M. Wood
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

    Re:    *United States* **v.** *Munish Sood,* **18 Cr. 620 (KMW)**

Dear Judge Wood:

    The Government respectfully submits this letter, pursuant to Section 5K1.1 of the United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines"), to advise the Court of the pertinent facts concerning the substantial assistance Munish Sood, the defendant, has provided in the investigation and prosecution of individuals involved in corruption of collegiate basketball. In October 2018, Sood testified as a Government witness as part of the prosecution and conviction of three individuals, an Adidas executive, an Adidas consultant, and an aspiring sports agent in *United States v. Gatto*, *et al.*, 17 Cr. 686 (LAK) (hereinafter "*Gatto*"), in connection with a scheme to funnel payments to the family members of prospective student-athletes in order to secure those athletes' commitment to Adidas-sponsored universities. In April 2019, Sood testified as part of the prosecution and conviction of two of the same defendants in *United States v. Evans, et al.*, 17 Cr. 684 (ER) (hereinafter "*Evans*"), in connection with a separate scheme involving bribe payments to men's college basketball coaches in order for these coaches to use their position and influence over their players to steer those players to sign with the bribe payers.

    In light of the defendant's substantial assistance, as set forth in additional detail below, and assuming that Sood continues to comply with the terms of his cooperation agreement and commits no additional crimes before sentencing, the Government intends to move at sentencing that the Court sentence Sood in light of the factors set forth in Section 5K1.1(a)(1)-(5) of the Sentencing Guidelines. This Court has scheduled Sood's sentencing hearing for September 12, 2019, at 12:00 p.m.

The Honorable Kimba M. Wood
September 5, 2019
Page 2 of 14

### I.  Case Background

Sood is a financial advisor and wealth manager based in Princeton, New Jersey. His prosecution arose out of a broader investigation by the United States Attorney's Office and the Federal Bureau of Investigation. On September 26, 2019, the United States Attorney's Office charged ten individuals across three cases, including an Adidas executive, four Division I college basketball coaches, an aspiring sports agent, and Sood, for college basketball related fraud and corruption schemes (collectively, the "NCAA defendants"). In particular, in *United States v. Gatto et al.*, 17 Mag. 7120, multiple defendants, including Sood, were charged with conspiring to defraud the University of Louisville and the University of Miami in connection with the awarding of athletic scholarships by funneling money from Adidas to the families of student-athletes in relation to their commitment to attend particular Adidas-sponsored universities. Moreover, in *United States v. Evans et al.*, 17 Mag. 7119, three Division I college basketball coaches, an aspiring sports agent, and Sood, were charged in connection with a scheme to bribe men's college basketball coaches in exchange for using their influence to steer their players to retain the services of the bribe payers, including Sood's financial advisory services.

As is detailed further below, Sood decided to cooperate shortly after being arrested and charged in the above-referenced Complaints, and began proffering with the Government in November 2017. During his proffer sessions, Sood candidly admitted his participation and role in the charged conduct and also informed the Government of a bribe payment to a men's college basketball coach that the Government had not previously been aware of prior to Sood's cooperation.

In August 2018, Sood pled guilty to a three-count Information pursuant to a cooperation agreement with the Government. As detailed herein, Sood was an important and significant cooperating witness at the October 2018 trial in *Gatto* and in the subsequent April 2019 trial in *Evans*.

### II.  Sood's Criminal Conduct

Sood participated in two separate schemes relating to corruption in college basketball. In the first scheme, Sood and his co-conspirators, including Dawkins and Code, paid bribes to men's college basketball coaches in exchange for the coaches agreeing to exert their influence over the student-athletes they coached to retain the services of Dawkins, Sood and the other bribe payers. Sood participated in this conduct with the goal of being retained as a financial advisor by these elite college basketball players once these student-athletes turned professional.

In the second scheme, Sood and other co-conspirators, including Dawkins and Code, engaged in a scheme to funnel illicit payments from Adidas executive James Gatto to the families of amateur student-athletes bound for NCAA Division I sponsored by Adidas. The payments were intentionally concealed from the universities because, as the defendants knew, the universities could not and would not issue athletic scholarships to student-athletes whose families had received tens of thousands of dollars in illicit payments.

### A. Sood's Initial Work With Professional Athletes

By way of background, in approximately 2002, Sood started his own wealth advisory firm, Princeton Advisory Group. Sood first became involved in providing financial advisory services to athletes after meeting Louis Martin Blazer III, a/k/a "Marty Blazer,"[1] in or about 2011. Blazer at the time was working with professional football players, providing, among other things, day-to-day cash management services to these athletes. Sood eventually partnered with Blazer, forming Princeton Blazer Advisory, and provided financial advisory and portfolio management services to professional football players.

In approximately 2013, Sood learned that the Securities and Exchange Commission ("SEC") was investigating Blazer for diverting client funds without their consent in order to make investments in certain film projects. Sood, who had not been aware of or involved in the diversion of client funds, decided to part ways with Blazer and bought out Blazer from Princeton Blazer Advisory and ceased working with him. While Sood continued to act as a financial advisor to certain professional football players after buying out Blazer, he did not recruit any new professional football players as clients thereafter.

### B. Sood's Initial Involvement In Making Illicit Payments to Recruit College Basketball Players As Clients

Sood stayed in periodic contact with Blazer during the interceding years. In early 2016, Blazer[2], introduced Sood to Dawkins, who at the time was working for a professional sports agency, ASM Sports, as a "runner" focused on recruiting new athletes to sign with ASM Sports. Dawkins was not a registered sports agent. As is discussed in further detail below, Sood first met Dawkins in connection with the scheme to bribe a coach at the University of South Carolina, Lamont Evans. Thereafter, and beginning in 2016, Dawkins began to request funds from Sood in order to assist Dawkins with a scheme to pay money directly to the families of top student-athletes in an effort to secure them as clients. Certain of the payments Sood provided were in the form of low interest or interest-free loans to players that had already been selected in the NBA Draft. Sood understood that, in certain instances, a portion of the funds he was providing as a loan would be used in order to reimburse Dawkins for funds Dawkins had previously provided while the student-athlete was still in college. In other instances, rather than requesting a loan to a particular player, Dawkins requested money from Sood that Dawkins intended to provide to the families and/or close associates of current student-athletes while the student-athletes were still enrolled in college. Sood provided these requested funds as to certain of the student-athletes. In addition, in or about 2016 Dawkins introduced Sood to another sports agent that worked for ASM Sports, Stephen Pina. Like Dawkins, Pina requested funds from Sood to be provided to the family members and associates of

---

[1] As discussed further herein, Blazer himself became a cooperating witness as part of this investigation, providing information and making numerous recordings (including recordings involving Sood) during the investigation. Blazer is referred to as CW-1 in the PSR and various charging instruments.

[2] By this time, Blazer had begun cooperating himself and was working at the direction of law enforcement.

Case 1:18-cr-00620-KMW   Document 79   Filed 09/05/19   Page 4 of 14

The Honorable Kimba M. Wood
September 5, 2019
Page 4 of 14

college athletes while the athletes were still in college, which Sood provided on at least one occasion. As Sood testified, he understood that these payments violated the NCAA's amateurism rules and that, if discovered, could lead to the college athletes losing their eligibility to compete and potentially losing their athletic scholarships from their universities.

Sood made all of the aforementioned payments with the aim of ultimately being retained as a financial advisor for the student-athletes that Dawkins and Pina were seeking to recruit as clients.

### C. The College Coach Bribery Scheme

Sood was involved in a scheme to make bribe payments to multiple NCAA men's college basketball coaches, including co-defendants Lamont Evans, Emanuel "Book Richardson," and Tony Bland. As detailed in the Indictments filed against Sood's co-conspirators, as well as through the trial evidence presented in *United States v. Evans et al.*, 17 Cr. 684 (ER), these bribe payments were in violation of NCAA rules and the coaches' employment agreements with their employers. In addition, the trial evidence established that by engaging in such blatant violations of NCAA rules, Sood and the coaches he bribed exposed the universities to the risk of substantial NCAA penalties, including financial penalties, limitations on post-season play, limitations on athletic scholarships, and recruiting restrictions.

#### 1. *Lamont Evans*

As is noted above, Sood was first introduced to Dawkins by Blazer in or about early 2016. In his early discussions with Sood, Blazer informed Sood that Dawkins had a relationship with an assistant men's college basketball coach at the University of South Carolina, *i.e.,* Evans, and that this coach could assist Blazer and Sood in recruiting players that he coached as clients. Sood understood from his conversations with Blazer that money would be provided to the coach in exchange for the coach directing his players to retain Blazer and Sood's services.

On March 3, 2016, Sood, Blazer, and Dawkins travelled to South Carolina to meet with Evans in the vicinity of the University of South Carolina's campus. During the meeting, the group explicitly discussed current university basketball players coached by Evans, whom Evans could steer and influence to retain the services of Blazer and/or Sood in exchange for bribes. Shortly after the meeting, Dawkins told Sood and Blazer that he previously had given Evans $2,500 per month during recent months in connection with an effort to recruit a specific player on the University of South Carolina men's basketball team ("Player-1")

In April 2016, Evans was hired as an assistant coach for the men's basketball team at Oklahoma State University. Evans spoke to Blazer by phone and assured him that his switching universities would not jeopardize his ability to still steer and influence Player-1's choice of an agent when he turned professional. On April 19, 2016, Blazer and Sood met with Evans in the lobby of a hotel in Manhattan, New York. Blazer provided $500 to Evans during Evans's visit to Manhattan.

Blazer continued to provide payments to Evans throughout 2016 and Blazer kept Sood apprised of the payments that he was making to Evans.  In August 2016, Sood and Blazer met with Evans in Miami, Florida.  Evans requested money from Sood during this trip, but Sood refused to pay Evans.  As Sood testified, because Blazer was already paying Evans, Sood did not believe that it made sense that he should also pay Evans at this juncture.  In addition, Sood wanted Evans to first prove that he could deliver student-athletes as clients – including by setting up meetings with the athletes or their families – before he would be willing to pay Evans.

Throughout the 2016-2017 NCAA Division I men's basketball season, Evans continued to receive bribe payments from Blazer. In exchange for these payments, Evans, among other things, set up an in-person meeting between Blazer and a current player on Oklahoma State University's basketball team whom Evans coached ("Player-2"), and sought to use his official position to influence Player-2 to retain Blazer's services upon turning professional, all in violation of, among other things, NCAA rules and Evans's duty to his employer, Oklahoma State University.  Blazer kept Sood apprised of these developments.  In total, Evans received payments totaling approximately $22,000. [3]

As Sood testified, he understood that the payments being made by Blazer to Evans were also to Sood's own benefit because they were intended to develop an ongoing relationship with Evans that would result in Evans similarly steering players to retain Sood.  Consistent with that understanding, in or about May 2017, Sood spoke directly with Evans in a call that was intercepted over a wiretap of Sood's cellular phone.  During the call, Evans offered to set up a meeting for Sood with the family members of Player-1.  Evans thereafter set up a meeting for Sood with Player-1's mother in June 2017, shortly before the NBA Draft which Player-1 had declared his intention to enter.  After arranging the meeting, Evans again requested money from Sood, and Sood gave Evans $2,000 in recognition of Evans having arranged the meeting for Sood with Player-1's mother.

    2. *Emanuel Richardson*

In or about February 2017, Sood spoke with Blazer about the prospect of making payments to another men's basketball coach, Emanuel Richardson, a/k/a "Book," who was an assistant coach at the University of Arizona.  Sood noted during the call that he did not know what the coach "want[ed]," but that Sood would "rather meet him face to face and get that clarity."

Thereafter, and consistent with the call described above, Sood in fact met with Richardson in Las Vegas.  During the meeting and in follow up calls that were intercepted during the investigation, Sood and Richardson generally discussed the high caliber of the players Richardson coached at the University of Arizona and how Sood could provide financial assistance for Richardson's recruiting efforts, while Richardson said he would "deliver" a player to Sood as a client in return.

---

[3] Judge Ramos principally sentenced Evans to three months' imprisonment in connection with his acceptance of these bribe payments.

In early May 2017, Dawkins was terminated by ASM Sports as a result of allegations that Dawkins had misused a client's credit charge to pay for tens of thousands of dollars in car service rides. Shortly thereafter, Dawkins decided to start his own sports management company called Loyd Inc., and Sood agreed to assist Dawkins in starting the venture. In May 2017, the FBI also introduced an undercover agent ("UC-1") to Sood and Dawkins through Blazer, who posed as Blazer's financial backer. UC-1 indicated he was interested in helping to provide funding for Dawkins should he decide to form his own sports management company. During in-person meetings in Manhattan, New York, Dawkins, Sood, and UC-1 discussed Dawkins's ability to leverage his relationship with athletes, their parents, and college coaches and how having influence over the coaches would be crucial in recruiting future clients.

In June 2017, Sood agreed to provide Dawkins with funding in exchange for receiving an equity share of Dawkins's new company. Under the terms of the agreement, Sood agreed to provide $40,000 in return for a 15% equity stake in the company. As captured in recorded conversations made at the time, Dawkins and Sood planned to make bribe payments to corrupt coaches in an effort to recruit new clients to their company.

Dawkins thereafter re-approached Richardson about receiving bribes in exchange for steering student athletes at the University of Arizona to retain the services of Dawkins's new company. On June 20, 2017, Dawkins arranged for Sood, Blazer, and UC-1, to meet with Richardson in a hotel room in Manhattan, NY. During the meeting the group discussed, among other things, a particular student-athlete ("Player 4"), who was on the men's basketball team at the University of Arizona. Richardson agreed to steer Player 4 to Dawkins and his company, stating, "I'm telling you [Dawkins is] getting [Player 4] . . . there's no ifs, ands about that. I've already talked with [Player 4's] mom, I've talked with his cousin." Richardson noted that he was "happy" to direct certain players to retain the services of the company controlled by Dawkins, Sood, and UC-1. At the end of the meeting, UC-1 gave Richardson $5,000 in cash in exchange for his agreement to steer and influence his players to sign with Dawkins' new company. In an intercepted telephone call before the meeting, Dawkins had informed Richardson that he expected UC-1 to provide Richardson with this $5,000.

Soon after the June 20, 2017 meeting, Richardson reached out to Dawkins requesting an additional $15,000 in order to secure the commitment of a top high school recruit to attend the University of Arizona. Dawkins relayed this request to Sood, and both Dawkins and Sood encouraged UC-1 to provide the $15,000 to Richardson so that Richardson could use these funds to secure the commitment of the student-athlete to the University of Arizona. On or about July 20, 2017, Richardson met with Sood and UC-1 at Sood's offices in New Jersey. During the meeting, Richardson discussed his willingness to steer current University of Arizona players to sign with Dawkins, Sood, UC-1 and their new company and at the end of the meeting UC-1 gave Richardson the $15,000 in cash in the presence of Sood.

In August 2017, Dawkins, Sood, and a second FBI undercover officer ("UC-2"), who was posing as a business partner of UC-1's, travelled to the University of Arizona to meet with Richardson. Thereafter, the group met with a cousin/handler of a current University of Arizona player as arranged by Richardson. During the meeting with Richardson, UC-2 thanked Richardson

for facilitating the meeting with the cousin of the University of Arizona player, and Richardson responded "I did my job." During the meeting with the cousin of the University of Arizona player, the cousin told the group that Richardson had recommended that the student-athlete should work with Dawkins, Sood and their new company.

As Sood testified at trial, Richardson had an agreement with Dawkins, Sood, and UC-1 that he would receive $5,000 per month going forward, but Richardson was arrested in September 2017 before any additional payments could be made to Richardson. In total, Richardson received $20,000 in bribe payments from Dawkins, Sood, and UC-1.[4]

    3. *Anthony Bland*

On or about June 20, 2017, Dawkins, Sood, Blazer, UC-1, and others met with Merl Code, a consultant for Adidas, in a Manhattan, New York hotel room. The purpose of the meeting was for Dawkins to introduce Code to others and to discuss potential business opportunities, including identifying assistant coaches who would be willing to accept bribe payments in return for steering players under their control to Dawkins and his new company. During this meeting Code specifically touted his close relationship with Richardson, among other coaches. UC-1 provided Code with a $5,000 payment at the end of the meeting.

In July 2017, Code thereafter arranged meetings for the group with various men's college basketball coaches in Las Vegas. Certain of these coaches, including Anthony Bland, an assistant coach at the University of Southern California, accepted bribe payments during the meetings arranged by Code.

As Sood testified, while he was not personally present at the meetings in Las Vegas, he was aware through Dawkins and UC-1 that the meetings with coaches were occurring in Las Vegas, and understood that certain of these coaches had received payments from the group.

In August 2017, Dawkins, Sood, and UC-2 travelled together to California to meet with Bland. During the trip, Bland assisted in making arrangements for Dawkins, Sood, and UC-2 to meet with family members and/or close associates of a current University of Southern California basketball player and one prospective recruit. These family members/associates received payments from the group during these meetings. On August 31, 2017, Dawkins, Sood, and UC-2 met with Bland at a restaurant on the University of Southern California campus. During the meeting, Bland informed the group that if they continued to fund the families of players and recruits, Bland would ensure that those players would retain Dawkins's and Sood's services. Dawkins also discussed the subject of paying players or their family members, telling Bland, Sood and UC-2 that "it's as clean as possible" to pay the families directly, instead of paying them through Bland, because if Bland were caught, the scheme would be over and Bland could no longer help. Bland then added, "my part of the job can be to get the parents, and to introduce them to

---

[4] Judge Ramos principally sentenced Richardson to three months' imprisonment in connection with his acceptance of these bribe payments.

Christian [Dawkins] and say hey, I trust him, and vouch for him and even you guys [UC-2 and Sood]."

In total, Bland received $4,100 in bribe payments in connection with the scheme.[5]

### D. The Scheme to Defraud the University of Louisville

In addition to the above-described coach bribery scheme, Sood also conspired with, among others, James Gatto of Adidas, Code, and Dawkins, to funnel approximately $100,000 from Adidas to Brian Bowen Sr., the father of Brian Bowen Jr. ("Bowen"), who was an all-American high school basketball player and considered at the time to be one of the top recruits in his class. The payments were intended to help secure Bowen's commitment to play basketball at the University of Louisville, a school sponsored by Adidas, and to further ensure that Bowen ultimately retained the services of the new sports management company that had recently been formed by Dawkins and Sood. As noted above, the scheme participants further agreed to conceal the payments from the University which would not have issued the athletic scholarship to Bowen had it been aware of them.

Sood was not involved in the scheme at its outset and only became involved after the funds had already been promised to Bowen's father. The plan to funnel $100,000 in payments to Bowen's father was formulated by Gatto, Code, and Dawkins, among others, during May 2017, after most of the top high school basketball recruits from the Class of 2017 had already committed to various universities. At the time, Bowen had not yet committed to a particular university. Specifically, on June 3, 2017, Bowen publicly announced his intention to enroll at the University of Louisville and to play for its NCAA Division I men's basketball team, becoming the highest-ranked recruit to commit to Louisville in nearly a decade. At the time and as part of that commitment, Bowen completed certain paperwork required by the University of Louisville, including a Student Athlete Statement in which Bowen represented that "all information provided" regarding "your amateur status" is "accurate and valid," and further affirmed his "understanding that if you sign this statement falsely or erroneously, you violate NCAA legislation and will further jeopardize your eligibility."

The scheme participants agreed to conceal the $100,000 payment, which was to be made to Bowen's father in four cash installments of $25,000, by causing the money to be transferred indirectly from Adidas to third-parties who then facilitated the cash payments to Bowen's family. In particular, Gatto and Code agreed and caused the first two $25,000 installments to be wired by Adidas pursuant to sham invoices to an organization under Code's control, from which the payments were then funneled to an account controlled by Dawkins. Dawkins, in turn, was responsible for delivering the cash payments to Bowen's father.

Sood first became directly involved in the scheme after there was a problem obtaining the first $25,000 installment payment from Adidas and Code and Dawkins needed another source to

---

[5] Judge Ramos principally sentenced Bland to two years' probation in connection with his acceptance of these bribe payments.

provide the first $25,000 for Bowen's father. Specifically, on July 10, 2017, Code spoke by telephone with Sood and UC-1 about the payments to Bowen's family. During the call, Code explained the involvement of Adidas in funneling money to Bowen's family, noting that "…this is one of those instances where we needed to step up and help one of our flagship schools in [the University of Louisville], you know, secure a five-star caliber kid. Obviously that helps, you know, our potential business…and that's an [Adidas-sponsored] school." Code explained that Adidas was having difficulty generating the funds to pay the first installment of the money because of internal "processes" at Adidas, and asked Sood and UC-1 to cover the first $25,000 payment with the understanding that they would ultimately be reimbursed by Adidas.

On July 13, 2017, Bowen's father traveled to New Jersey in order to receive the first cash payment from Sood. Prior to the meeting, Sood met with UC-1 in order to receive an envelope containing the cash for Bowen Sr. As Sood described when he testified in the *Gatto* trial, Sood met with Bowen's father in a parking lot in New Jersey and provided an envelope containing the $19,400.[6] During the meeting, which was brief, Sood and Bowen Sr. also discussed Bowen and Sood's desire to further develop a relationship and work with Bowen. Sood testified that he understood the funds were being provided in cash so that they could not later be traced.

In a subsequent telephone call with Dawkins after the cash handoff, Sood informed Dawkins that based upon Sood's conversation with Bowen's father, Sood believed that Bowen would sign with Dawkins and Sood upon entering the NBA.

### III.     Sood's Arrest and Subsequent Cooperation

Sood was arrested and charged in two separate Complaints on September 26, 2017. Complaint 17 Mag. 7119 charged Sood with conspiring to commit bribery, multiple counts of bribery, honest services wire fraud conspiracy, honest services wire fraud, wire fraud conspiracy, and Travel Act conspiracy, in connection with Sood's participation in the college basketball coach bribery scheme. Complaint 17 Mag. 7120 charged Sood with wire fraud conspiracy and wire fraud in connection with his participation in the scheme to defraud the University of Louisville.[7]

At the time of his arrest, Sood waived his rights and agreed to speak with the FBI without counsel. During this initial interview, Sood lied about certain matters, including regarding his involvement in making payments to the families of college basketball players and his involvement in making payments to coaches, including Emanuel Richardson.[8]

---

[6] At Dawkins' direction, Sood had transferred the remaining $5,600 to Dawkins directly.

[7] The Complaint also charged Sood with a money laundering conspiracy. However, the Indictment that followed in *United States v. Gatto*, 17 Cr. 686 (LAK), did not charge Sood's co-defendants with money laundering.

[8] Pursuant to his cooperation agreement, the Government agreed to not further prosecute Sood for these false statements if Sood fully complied with the understandings specified in his cooperation agreement.

Soon after his arrest, through his attorneys Sood expressed an interest in cooperation, and Sood began proffering in November 2017. Thereafter, Sood proffered with the Government on multiple occasions. During these proffer sessions, Sood was candid and truthful and provided insights regarding the inner workings of the criminal conspiracy that only could be provided by an insider. Sood also provided information previously unknown to the Government, including details of certain payments Sood had made to the families of student-athletes through Dawkins while Dawkins was still employed by ASM Sports, and payments that Sood had made to coach Lamont Evans directly that the Government was not previously aware of.

On August 27, 2018, pursuant to a cooperation agreement with the Government, Sood pleaded guilty to a three-count Information charging him with: (1) one count of conspiracy under 18 U.S.C. § 371 with three objects: (i) offering and to pay bribes to NCAA Division I men's college basketball coaches in exchange for those coaches agreeing to and exerting influence over student-athletes under their control to retain the services of the defendant and other scheme participants, in violation of 18 U.S.C. § 666; (ii) depriving the employers of NCAA Division I men's college basketball coaches of the right to their employees' honest services through the payment of bribes to those coaches, in violation of 18 U.S.C. § 1343 and 1346; and (iii) traveling in interstate commerce and using the mail and facilities in interstate and foreign commerce in order to offer bribes to men's college basketball coaches at NCAA Division I universities in violation of certain state commercial bribery statutes, in violation of 18 U.S.C. 1952(a)(1) and (a)(3); (2) a scheme to pay bribes to NCAA Division I men's college basketball coaches in exchange for those coaches agreeing to and exerting influence over student-athletes under their control to retain the services of the defendant and other scheme participants, in violation of 18 U.S.C. § 666; and (3) a conspiracy to defraud NCAA Division I universities by paying and concealing, including through false representations and pretenses, payments to prospective and current student-athletes at those universities, and their families, in violation of 18 U.S.C. § 1349.[9]

As is detailed further below, Sood was a crucial witness at the trials in both the *Gatto* and *Evans* trials, and his cooperation was critical to the Government's successful prosecution of all three defendants in *Gatto* and both defendants in *Evans*.[10] Sood testified for one day in the *Gatto* trial and for three days in the *Evans* trial.

IV. **Substantial Assistance Provided by Sood**

Sood complied fully with the requirements of his cooperation agreement. He has provided substantial and valuable assistance to the Government in connection with its investigation and prosecution of the corrupting influence of money in college basketball. He met with the

---

[9] The Government is in accord with the Guidelines calculation set forth in the Presentence Investigation Report. Per the PSR, the total offense level is 21 (PSR ¶ 128), and the defendant is in Criminal History Category I. (PSR ¶ 131). Accordingly, the applicable Guidelines range is 37 to 46 months' imprisonment.

[10] In the *Gatto* case, James Gatto was sentenced to 9 months' imprisonment, Merl Code was sentenced to 6 months' imprisonment, and Christian Dawkins was sentenced to 6 months' imprisonment. Dawkins and Code have yet to be sentenced in *Evans.*

Government dozens of times for multiple hours at a time in order to prepare for his testimony at two trials. He was consistently truthful and forthcoming. As is discussed in further detail below, Sood's cooperation greatly assisted in the successful prosecution of the defendants in both *Gatto* and *Evans*.

Section 5K1.1 of the Sentencing Guidelines sets forth five non-exclusive factors that sentencing courts are encouraged to consider in determining the appropriate sentencing reduction for a defendant who has rendered substantial assistance: (1) "significance and usefulness" of assistance; (2) "truthfulness, completeness, and reliability" of information; (3) "nature and extent" of assistance; (4) "any injury suffered, or any danger or risk of injury to the defendant or his family" resulting from assistance; and (5) "timeliness" of assistance. U.S.S.G. § 5K1.1. The Government respectfully submits that these factors, as applied to the defendant's cooperation, present a mitigating consideration at sentencing.

### A. Significance and usefulness of assistance (5K1.1(a)(1))

Sood's cooperation was both highly significant and very useful and contributed to the successful prosecution of two important and difficult trials. In *Gatto*, Sood's testimony provided an insider's perspective on the conspiracy to defraud the University of Louisville. Sood was also able to provide the jury with important context regarding a number of significant recorded conversations to which Sood had been a party, including a July 2017 call in which Code set out in detail exactly how the scheme to funnel payments to Bowen's father would operate. Sood also gave a firsthand account of the handoff of cash to Bowen's father, and walked the jury through a series of important recorded conversations with Dawkins that reflected their consciousness of guilt and understanding that their actions were wrong and unlawful. Sood also unambiguously acknowledged his understanding that the payments to Bowen's father would not be disclosed to the University of Louisville and that he understood that were the payments discovered the student-athletes at-issue would be deemed ineligible and could lose their athletic scholarships, testimony that was particularly important at a trial where Sood's co-conspirators' intent was the primary issue in dispute.

Sood was the only cooperating witness in the Government's investigation of corruption in college basketball to testify at both the *Gatto* and the *Evans* trials. In the trial of Dawkins and Code in *Evans*, Sood's testimony spanned three trial days. His testimony was crucial in this trial as Sood was the only member of the conspiracy to testify.[11] During his testimony, Sood provided the jury with his understanding of hours of recorded meetings and telephone calls, providing crucial context for conversations that were often cryptic in nature. As to many of these meetings and calls, Sood was the only witness who was a participant and thus his understanding of the meaning of these conversations was particularly significant in providing a comprehensible narrative to the jury. During his testimony, Sood unequivocally and repeatedly explained that the entire driving purpose of the scheme was to pay off coaches so that they would use their position and influence to steer their players to Sood, Dawkins, and their new company. Sood also

---

[11] Blazer also testified but all of his actions in connection with the investigation were at the direction of law enforcement.

effectively tied Code to the conspiracy and explained his role therein, including his role in identifying and introducing coaches willing to accept bribes, which was critical particularly given Code's trial defense.

Sood's testimony in both trials was significant and credible, and he put his own actions and those of the other scheme participants in context for the jury. He took responsibility for his own misconduct, and he acknowledged that he knew this conduct was wrong at the time that he and his co-conspirators were engaging in these corrupt payments. Sood truthfully answered questions from both the Government and on cross examination. As recording after recording was played at trial, Sood walked the jury through exactly how both the coach bribery scheme and the Adidas scheme operated, what different participants' roles were in each scheme, and his understanding as to what his co-conspirators meant when they made certain statements, many of which were cryptic and coded. In sum, his assistance was both incredibly significant and useful.

> B. "[T]ruthfulness, completeness, and reliability" of information and testimony (5K1.1(a)(2))

The information provided by Sood was truthful, complete, and reliable. Sood was forthcoming during his proffers, detailing the full scope of his activities and informing the Government of certain information that it was not previously aware of, including a payment that he had independently made to Lamont Evans. Moreover, much of the information he provided was corroborated by other evidence and witnesses.

> C. "[N]ature and extent" of assistance (5K1.1(a)(3))

Sood's cooperation was extensive by virtually any measure. He spent hour after hour meeting with the Government in order to prepare for his trial testimony. Because he still ran his own business during the entire period of his cooperation, Sood frequently had to review lengthy recorded videos and telephone calls late in the evening and on weekends. In the lead up to both trials, Sood met with the Government on multiple occasions on the weekend and late into the evening. He walked the Government through numerous recorded meetings and calls in painstaking detail in preparing for his testimony. He testified for one day in the *Gatto* trial and three days in the *Evans* trial, which included lengthy cross examination by multiple lawyers and significant media scrutiny.

> D. "[A]ny injury suffered, or any danger or risk of injury to the defendant or his family" resulting from assistance (5K1.1(a)(4))

While the Government is not aware of any danger or risk of injury to the defendant or his family, it bears mention that Sood's cooperation required Sood to provide information regarding Dawkins, an individual he had grown close with based on their close dealings in recent years. Sood's reputation in the financial world also suffered as a result of his cooperation, and Sood recounted his involvement in payments to the families and handlers of student-athletes that had not previously been exposed by the Government's investigation. This included publicly admitting

The Honorable Kimba M. Wood
September 5, 2019
Page 13 of 14

to his involvement in a payment to the handler of one of Sood's current clients, a prominent NBA basketball player.

### E. "Timeliness" of assistance (5K1.1(a)(5))

Sood began cooperating shortly after he was arrested in September 2017. He proffered multiple times with the Government beginning in November 2017, and entered a plea of guilty before the trial in *Gatto* and months before any of Sood's co-defendants in *Evans* had pled guilty. In sum, Sood's assistance was certainly timely.

The Honorable Kimba M. Wood
September 5, 2019
Page 14 of 14

### V.     Conclusion

In light of the foregoing, the Government respectfully submits that Sood's assistance was "significan[t] and useful[]" to the Government in its investigation and prosecution of a criminal scheme involving the corrupt influence of money in college basketball. *See* U.S. Sentencing Guidelines § 5K1.1(a)(1). The Government also believes that the information provided by Sood was "truthful[], complete[], and reliab[le]." *See id.* § 5K1.1(a)(2). Accordingly, assuming that Sood continues to comply with the terms of his cooperation, and commits no additional crimes before sentencing, the Government intends to move at sentencing, pursuant to Section 5K1.1 of the U.S. Sentencing Guidelines and Section 3553(e) of Title 18, United States Code, that the Court sentence Sood in light of the factors set forth in Section 5K1.1(a)(1)-(5) of the Guidelines.[12]

Respectfully Submitted,

AUDREY STRAUSS
Attorney for the United States Acting Under
Authority Conferred by 28 U.S.C. § 515

By:   /s/
Noah Solowiejczyk
Assistant United States Attorney
(212) 637-2473

cc:    Richard Zack, Esq. (by ECF)
       U.S. Probation Officer Walter Quinn (by email)

---

[12] In addition, with respect to Count Three of the Information, the Government is seeking restitution from Sood in the amount of $28,261. This amount is consistent with the restitution that Judge Kaplan ordered defendants pay to the University of Louisville in connection with the scheme to defraud that university. *See* 17 Cr. 686, Dkt. Nos. 308, 309. Sood will be held jointly and severally for this restitution obligation with James Gatto, Merl Code, Christian Dawkins and Thomas Gassnola. In connection with the coach bribery scheme, none of the relevant universities that employed the three charged co-defendants – Lamont Evans, Emanuel Richardson, and Anthony Bland – sought restitution in the *Evans* proceeding before Judge Ramos. The Government is awaiting further information from Creighton University and Texas Christian University with respect to whether they will seek restitution. Once the Government has this information, it will submit a proposed restitution order to the Court in advance of sentencing.